## SACRAMENTO COUNTY *vs.* RHODES & MADDUX.

*Sixth Judicial District Court, July,* 1856.

POWER OF THE BOARD OF SUPERVISORS TO PURCHASE STOCK IN PLANK
ROADS—VOID INSTRUMENTS.

The power given under the Act of 1855 to the Board of Supervisors of the several coun-
ties, to lay out, control and manage roads, &c., does not include the power to purchase
roads already laid out by individuals or corporations.

The Board of Supervisors is the mere agent of the county, with limited power and juris-
diction, and can exercise no greater authority than has been delegated, and such as
may be absolutely necessary to carry into effect the delegated powers.

The Supervisors have no power to purchase stock in a corporation and make the county
stockholders.

Courts of equity may interpose their authority to order a cancellation or delivering up of
written instruments void on their face.

*Harmon, Sunderland & Stanley,* for plaintiff.

*Beatty, Robinson & Botts,* for defendants.

The cause is fully reported in the decision of Judge Howell.

HOWELL, J.—By consent of parties the issues of fact herein were
submitted to the Court for trial without the intervention of a jury,
and from the evidence I find the following facts, to wit:

1st. That on the 15th day of September, 1855, the "Board of
Supervisors of Sacramento county," acting for and on behalf of said
county, entered into a contract with the defendant, John M. Rhodes,
for the purchase of nine hundred shares of the capital stock of the
"Sacramento Turnpike and Plank Road Company," a joint stock
company incorporated under the provisions of the act of the 12th of
May, 1853, for the consideration of twenty-six thousand dollars in the
warrants of said county, drawn upon the general fund.

2d. That said contract is evidenced by the following instrument in
writing and order of said Board, viz: "For and in consideration of
the sum of twenty-six thousand dollars in warrants of the county of
Sacramento to me in hand paid by the Board of Supervisors of said
county, I have sold and transferred to said county nine hundred
shares of the capital stock of the ' Sacramento Turnpike and Plank

Road Company,' reserving, however, my proportions, to wit: three-fourths of all money in the hands of the Treasurer of said company.
SACRAMENTO, September 15th, 1855.

    (Signed)               JOHN M. RHODES.

"PLANK ROAD, September 15th, 1855.—On this day comes J. M. Rhodes before the Board, and makes a transfer duly executed to the Board of Supervisors, on behalf of the county of Sacramento, of his entire interest in nine hundred shares of the capital stock of the 'Sacramento Turnpike and Plank Road Company,' reserving to himself three-fourths of all money now in the hands of the Treasurer of said company, for and in consideration of which said Board, on behalf of said county, agree to pay the said J. M. Rhodes the sum of twenty-six thousand dollars in warrants of the county of Sacramento. Wherefore it is ordered that the County Auditor be and he is hereby authorized to draw his warrant or warrants on the County Treasurer for the sum of twenty-six thousand dollars in favor of J. M. Rhodes, payable out of any money in the county treasury, not otherwise appropriated, belonging to the general county fund."

3d. That in pursuance of, and in accordance with the foregoing contract and order, the Auditor of said county drew and delivered to the said John M. Rhodes twenty-six warrants upon the County Treasurer, for one thousand dollars each, payable to the said Rhodes out of any money in the treasury belonging to the general county fund, not otherwise appropriated, and numbered from 480 to 505, and inclusive of said numbers; which said warrants were duly presented to the Treasurer of said county on the 15th day of September, 1855, and by him endorsed "not paid for the want of funds," and his name signed to said endorsement.

4th. That the capital stock of said "Sacramento Turnpike and Plank Road Company," is one hundred and twenty thousand dollars, divided into twelve hundred shares, of one hundred dollars each, and that the nine hundred shares purchased by the said Board, were then and there at the time of said purchase delivered to the said Board by the said John M. Rhodes, and were his property.

5th. That the term of office of said Board of Supervisors expired on the 30th day of September, 1855, and that the day before the

expiration of their term, each member of said Board was elected a Director in said joint stock company, and each purchased a share of the stock of said company.

6th. Prior to the making of the contract of purchase, the Board met, and one of them estimated the revenue of the county for current expenses at from one hundred and twenty-two to one hundred and twenty-five thousand dollars, and another at one hundred and thirty-three thousand dollars. In this estimate they dated the fiscal year as commencing on the first Monday in May. This estimate was not placed on file, nor was there any record made of it. They at the same time made an estimate of the debts and liabilities of the county, salaries of county officers, &c., which added to the twenty-six thousand dollars purchase money, fall considerably short of the estimated revenues.

7. The witnesses for the plaintiff made the following estimates, viz:

The debts and liabilities created from Jan. 1st, 1855, to April 15th, 1855..$115,225 81
Debts and liabilities created from Jan. 1st, 1855, to May 1st, 1855....... 30,710 31
                                                                          _____
                                                                          $84,515 50

Estimated annual expenses............... ........................ 85,000 00
Estimated expenses fixed by law, from Sept. 15th, 1855, to May 1st, 1856 53,124 99
To which add the......................................... ...... 84,515 50
                                                                          _____
                                                                          $137,640 49

8th. This estimate was taken from the records of the county, and is based upon receipts for the present and past years, and is as nearly correct as such estimates can be made.

9th. That petitions signed by about three hundred and fifty inhabitants of the county, were presented to the Board before the purchase, praying the establishment of a road on or near the same line now occupied by this road. That said road is embraced within the limits of Sacramento county—that large quantities of freight pass over this road for the supply of citizens in the eastern portion of the county, and that the toll charged for teams prior to the purchase was three dollars each, which has since been reduced to twenty-five cents each.

10th. That the county warrants of Sacramento county drawn upon the general fund were worth at the time of this purchase seventy cents on the dollar.

11th. That the warrants received by the defendant, Rhodes, for the nine hundred shares of stock, were transferred by him to a third party before this suit, but for what purpose does not appear from the testimony, nor does it appear that the party to whom they were transferred had any other or further notice of the nature of the transaction than the warrants themselves would impart.

12th. That the defendant, Maddux, is the present Treasurer of Sacramento county, and as such has charge of the funds of the county and the books of his office, and that upon said books are registered in their regular order the warrants issued to the said John M. Rhodes, and the said Maddux declares that he will pay them in their regular order, unless restrained or prevented from so doing by competent authority.

13th. That no demand was made of the said Rhodes for said warrants prior to the institution of this suit, but all legal objections on account thereof, if any existed, were waived by the defendants on the trial.

My conclusion of law, based upon the foregoing facts are, that the contract for the purchase of said stock is absolutely void—that its invalidity is apparent upon its face, and upon the face of the warrants, and that the county has a complete defense at law, and that the relief sought cannot be granted upon the allegations in the bill, and the facts proven, and that the bill ought to be dismissed at plaintiff's costs, and it is dismissed accordingly.

J. M. HOWELL, District Judge.

The prayer of the bill is that said sale and purchase be declared illegal, fraudulent and void; that the order of said Board of Supervisors, authorizing the Auditor of Sacramento county to draw warrants, be also declared null and void; that said twenty-six warrants be declared null and void, and that the said Rhodes be required to deliver them up to be cancelled; or, that he be decreed to pay plaintiff their value, $26,000; and that the defendant, Maddux, be directed to cancel and erase from his official books the registry of said warrants, and he and his successors in office forever enjoined and restrained from paying the same, or any portion thereof.

The first question to be considered is, whether the Board of Supervisors exceeded its authority in making the contract of purchase.

The 5th Section of the 11th Article of the Constitution declares that, " The Legislature shall have power to provide for the election of a Board of Supervisors in each county, and these Supervisors shall jointly and individually perform such duties as may be prescribed by law." In pursuance of this provision, the Legislature has provided for the election of a Board of Supervisors in the several counties of the State, and conferred upon them the following powers, among others, viz : " To lay out, contract, and manage public roads, turpikes, ferries and bridges within the county, in all cases where the law does not prohibit such jurisdiction, and to make such orders as may be necessary and requisite to carry its control and management into effect. (4th subdivision, sec. 9, Acts, '55, p. 53.)

" To lease or to purchase any real or personal property necessary for the use of the county : *provided*, no purchase of real property shall be made, unless the value of the same be previously estimated by three disinterested persons, to be appointed by the County Judge." (Sub. 9, sec. 9.)

" It shall have and exercise in its county all jurisdiction and powers other than criminal, conferred by any law on the Court of Sessions, or heretofore exercised by said Court under any statute, or by any statute provided, to be exercised by said Court, when the same does not conflict with the provisions of this Act. (Sec. 25, p. 56.)

" And to do and perform all such acts and things as may be strictly necessary to the full discharge of the powers and jurisdiction conferred on the Board."

If the Board of Supervisors possesses the power to make the contract, it was derived from the foregoing provisions of the statute. It is created by statute, derives all of its powers from, and cannot go beyond its provisions. This proposition is admitted by defendants' counsel, and hence it is not necessary to cite authorities in its support.

We are then brought to a consideration of the statute, and the powers and jurisdiction it confers. What is meant by the power to " lay out, control, and manage public roads, turnpikes, &c. ?" If the power to " lay out " includes the power to purchase, as is contended by defendants' counsel, then, unless the transaction is tainted with fraud, it is beyond the power of this court to disturb it, however unwise or injudicious it may have been. For it is a universal principle that, where

power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only question that can arise between an individual's claiming a right under the acts done, and the public, or any person denying its validity, are power in the officer, and fraud in the party." (Arredondo case, 6th Peters R. 129, and the authorities there cited.) In this case, fraud either in the Board, or the defendant Rhodes, has not been seriously urged; hence the question is one of "power" alone in the Supervisors.

The words "to lay out" in their ordinary acceptation, mean, to purpose, to intend, to take measures, &c. As a delegation of power to the Board of Supervisors, they were used in the same sense in which they were employed in the act respecting "roads and highways." The 9th section of that act declares that "The Board of Supervisors of each county, on presentation of a petition praying for a County Road, to be *laid out* within the county, or praying for a cart road to be *laid out* from the dwelling or plantation of any person to any public road, or from one public road to another, and *designating* the points therein, shall cause notice to be given to the parties owning the land over which said road is to be located; and if objections by one or more of the owners shall be made, the Board of Supervisors shall consider and determine the same at the next regular meeting, and if they shall be of the opinion that such road is necessary, they shall appoint two persons as viewers, to view out and locate said road, and upon the return of the certificate of the viewers, shall declare the same to be a public highway.

They are found only in the act confining the powers and jurisdiction of the Board, and in the section I have just quoted. If their meaning is doubtful, and interpretation necessary, we must first resort to the Act and endeavor to ascertain from that what was intended, before looking elsewhere. The first section of the Act (concerning roads and highways,) makes all roads public highways which have been, or may hereafter be, declared such by the Board of Supervisors. Section 2 makes it the duty of the Board to divide the county into suitable road

districts, and to appoint an overseer for each. The overseers are required to keep the roads within their districts clear of all obstructions and in good repair, causing banks to be graded, bridges and causeways to be constructed, and kept in repair and replaced when destroyed. (Sec. 5.) They may use such gravel and dirt as may be absolutely necessary in improving the roads in the district, and the Board of Supervisors shall allow the owners thereof such damages as will be just. (Sec. 5.) The Board has power to levy a tax of four dollars on each able bodied male inhabitant within the county, between the ages of twenty-one and fifty years, and also a property tax of five cents on each one hundred dollars worth of property for road purposes, (Sec. 6;) the four dollar tax to be collected and applied by the road overseers in their districts, and the tax of five cents to be collected by the Sheriff and paid into the County Treasury for road purposes. (Sec. 7.) The overseers may make private contracts for the improvement of their roads at a cost not exceeding fifty dollars, and over that sum by advertising for bids, and pay the same out of the funds in their hands (Sec. 8,) reporting to the Board quarterly the amount of funds collected and paid out, and how applied. (Sec. 10.) Fines may be collected from delinquents, and are required to be paid into the County Treasury, for the use of the road district in which they were collected.

From these several sections it will be discovered that when a road has been used by the public it is converted into a public highway by a declaration to that effect by the Board of Supervisors. That if a new road is desired, the power of the Board is brought into action by the presentation of a petition asking that one be " laid out," designating therein its termini and general direction. If the Board deem the road necessary, persons are appointed to " view out and locate it," and upon the return of their certificate it is declared a public highway. The damages resulting to the owners over whose lands the road may be located, are to be assessed by the Board after the petition is presented, upon public notice, at a regular term, and before the road is declared a public highway.

Now, I think it manifest that the words " to lay out " and " to view out and locate," as used in the act, mean one and the same thing. The road is " laid out " and " viewed out and located." Or, in other words, its direction, its width and its termini are fixed and described

by those appointed for that purpose, and as thus fixed and described to be a public highway.

It is true, the Board can do something more than fix the extent, direction and boundaries of the road, and declare it a public highway. It may assess damages to the land-holders along its route, but this power extends no further than to condemn the land to public use, and assess to the owner such damages as he may sustain by reason thereof; and in the exercise of this power the Board discharged the functions merely of jurors in other States under the writ of *ad quod damnum.* After its verdict is made, or the amount of damages fixed, it exercises the further power of ordering these damages to be paid, but the payment is made out of the road instead of the general fund, as I shall hereafter show, and the power to do so is derived not from the expression " to lay out," but from other portions of the statute.

After the road is laid out, then it becomes the duty of the overseers of the districts through which it passes, to cause it to be put in such a condition as to be traveled ; by causing the banks to be graded, bridges and causeways to be constructed, &c., &c. ; and the expense or cost of doing so is paid out of the funds in their hands, and the five cent. property tax. These two funds were deemed by the Legislature sufficient for road purposes, and were directed to be applied by particular persons and for particular objects. I know no instance until the present where the general funds of the county were attempted to be applied in this way, or to the purchase of a road, and if the power exists, it is strange that the Legislature should not have been more explicit in conferring it ; and that they should have provided a special fund for this object, when there was one already at the command of the Board to which it could resort.

The fact, however, that the Board ordered the purchase money to be paid out of the wrong fund, would not of itself invalidate the contract. But when we consider that the general fund cannot be resorted to, and that the special road fund is to be applied to particlar objects, and that the purchase of a road is not of the number, it seems to assist us in ascertaining the intention of the Legislature and the power of the Board.

Again, as an illustration of what was intended by the power to " lay out " a road, the Act of 1850 (now repealed) authorized the Court of

Sessions to " lay out " cart roads for the accommodation of private individuals, from residences or plantations, to any public road. The same power is vested in the Board of Supervisors by the 9th section of the Act of 1855, and the only difference is that the latter is less specific than the former. But in the latter the words " to be laid out," apply equally to private cart roads as to public highways. And although it may be questioned whether the Board could legally exercise the power attempted to be conferred, by laying out a road over the lands of private individuals for private purposes, still, the employment of the terms in the connection in which they appear, equally serve to show the intention of the Legislature. No one will pretend that the Board of Supervisors will appropriate the funds of the county in the purchase of roads for the accommodation of private individuals, in getting from their farms and residences to some public highway. And yet, if the power to " lay out," includes the power to purchase, the delegation of authority is just as broad in the one case as the other. To say that the Legislature, in the one instance, intended to delegate the power to purchase, and in the other, merely to mark out and define the boundaries, distances, &c., is to accuse that body of a most singular and unique mode of getting at the idea intended.

So much for new roads or roads to be " laid out." The defendants' counsel contend that where a road is already established and put in proper condition for the accommodation of the traveling public, and the right of way secured, the Board of Supervisors may purchase it, if they deem it necessary for the use of the county. This power they derive from the words to " lay out," which we have already examined. The only mention made in the statute of words to this description, is to be found in the first section of the Act of 1855, which declares that all roads shall be considered public highways which have been used and declared to be such by the Board of Supervisors.

Now, if the power to " lay out" does not include the power to purchase, as we think we have shown, it cannot be conferred by the necessities of public convenience, or the right to declare the road a public highway, that has already been used as such.

But the Board may " lease or purchase any real or personal property, necessary for the use of the county," and here it is contended the power rests, if it is not to be found in the other provisions of the

statute. It must be borne in mind that the Board of Supervisors is the mere agent of the county, with limited power and jurisdiction, and that it can exercise no greater authority than has been delegated, and such as may be " absolutely necessary " to carry into effect the delegated powers.

They are authorised, and it is made their duty, to erect court houses, jails and other public buildings, and to furnish the same in a suitable manner. In the discharge of this duty, if it were inconvenient for the time being, to erect and furnish these buildings, they might be leased, including the furniture (personal property) necessary for the use of the county. If they desire to erect such buildings, the power to do so *necessarily* includes the power to purchase lots on which to build, (real estate,) and the materials for the structure, and furniture for its use ; and this, I apprehend, was what was meant by the power to lease and purchase real or personal property.

We have seen that if the Board has the power to make purchases of this description, a right acquired under it cannot be disturbed except for fraud in the Board, or the party claiming such right. The power once granted, the county would be completely at the mercy of the Board's discretion. The word " necessary " could not control, for " the degree of the necessity cannot be a test of the right, but of expediency only," (4th Wheaton, 432 ; 2d Story on the Constitution, 143.) If the Legislature did not intend to limit the Boards, in leasing and purchasing the *kind* of property to which I have referred, then they are unlimited and uncontrolled, except by their own discretion. The counties which they represent are completely within their power and under their control. They may incur debts to an unlimited amount, (at least if the counsel for the defendants be correct upon another point argued in this case,) and tax the people without stint or measure. Should they, in their discretion, become satisfied that the Sacramento Valley Railroad, or the Steam Navigation Company's property, was " necessary for the use of the county," they could make the purchase, and the county and its citizens would be powerless. If (as has been remarked by the plaintiff's counsel) such a power exists, it is time it was understood, for I doubt whether the citizens of Sacramento county are willing that it should abide therein, however prudent and discreet the Board may be.

2

But admit that in this respect I am indiscreet, and that the Board does, as an abstract proposition, possess the power to purchase roads and other property for the use of the county ; still there is another objection to this contract, which is, in my mind an insuperable one.

It will be recollected that this road was owned by a joint stock corporation, and that the property in it was represented by twelve hundred shares of capital stock. The Board of Supervisors purchased nine hundred of these shares, and if the contract was valid, thereby became a stockholder in the company, entitled to all of the privileges, and incurring all the liabilities of stockholders. Because the stock passes into the hands of the county, the company was not thereby dissolved or disincorporated.

Let us see what some of the liabilities of a company of this description are, or rather its stockholders, and what they may do.

They may elect a President, Secretary, Treasurer, and a Board of Trustees.

The company may sue, and be sued ; purchase, hold, sell, and convey real and personal property for the use of the corporation ; appoint officers and agents to manage its affairs, and pay them such salaries as the stockholders may agree upon ; pass by-laws, not inconsistent with the laws of the State, for the management of the property of the company ; and borrow money after twenty-five per cent. of its capital stock has been paid in, and mortgage or hypothecate its stock to secure its payment.

It is liable to be sued for damages for the conduct of its employees and agents, and each stockholder is individually responsible for his portion of the debts of the company.

Now if this purchase be a valid one, the county owns property over which neither she nor the present Board of Supervisors have any control ; for it will be recollected that the members of the old Board are directors, and managing the stock on behalf of the county, and that the present Board has nothing to do with it.

But it seems to me that a mere statement of this proposition, and a glance at the consequences resulting from such a power, are sufficient to show that it does not exist.

For these and many others reasons that might be given, I am of the opinion that the contract for the purchase of this stock is illegal, without

authority of law, and void.   And this renders it necessary for me to decide another question in the case as to the legality of this contract—based upon estimates of the liabilities of the county at the time it was made.   I have found the facts so that it may be raised in the Supreme Court, if the case goes there, and the parties desire it, though I shall not discuss it.

The only remaining proposition to be determined is the propriety, under the views I have taken of the contract, of granting the relief sought by the bill, or rather the power to do so.

It was once much doubted whether a court of equity could interfere to compel an instrument, void upon its face, to be delivered up and cancelled.   But whatever may have been the doubts or difficulties formally entertained upon this subject, they seem, by the more modern decisions, to be fairly put at rest; and the jurisdiction is now maintained in the fullest.   (Story's Eq., § 700.)   This latter doctrine is maintained, however, upon the ground that, if the instrument be negotiable, it may be used for a fraudulent or impure purpose, to the injury of the third parties :   or if a deed purporting to convey lands or other inheritances, that it may operate as a cloud upon the title.   That if it be an instrument of a different character, it may be applied to improper purposes, or used in after time to promote vexatious litigation, *when the proper evidence* to repeal the claim may have been lost or destroyed, &c.   But this " whole doctrine is referable to the general jurisdiction which courts of equity exercise in favor of a party quia timet."   And, " where the illegality of the agreement, deed or other instrument appears upon the face of it, so that its nullity can admit of no doubt, the same reason for the interference of courts of equity, to direct it to be cancelled or delivered up, would not seem to apply ; for, in such a case, there can be no danger that the lapse of time may deprive the party of his full means of defense ; nor can it in any just cause be said that such a paper can throw a cloud over his right or title, or diminish its security, nor is it capable of being used as a means of vexatious litigation or serious injury.   And, accordingly, it is now fully established that, in such cases, courts of equity will not interpose their authority to order a cancellation or delivery up of such instrument." (Story's Eq., § 700 and 701.)

In such a case, it will be regarded as " an important paper, which

cannot avail its possessor." (6th Peters, 97.) I have examined the most of the decisions cited by plaintiff's counsel upon this point, and the doctrines held by them do not materially differ from the rule above laid down, which I think the correct one.

Testing this case, then, by this rule, ought the relief which plaintiff seeks to be granted? I think not. If I am correct in my legal conclusions as to the contract, it is an utter nullity, void upon its face, and impotent to bind the county. The evidence of its existence is a matter of record, spread upon the minutes of the Board of Supervisors of Sacramento county, and is not subject to be lost or destroyed. The warrants issued in payment of the stock " distinctly specify the liability for which they were drawn, and when it accrues," and they carry upon their face the evidence of their own invalidity, and the supposed liability for which they are issued. No one can take them as an innocent holder or purchaser, and thereby protect himself, for no one can take them without notice. Neither Rhodes nor his assignee, whoever he may be, acquired any rights under them ; and if the Treasurer pays them, he does it voluntarily, at his own risk, and with full notice of the consequences. This suit was brought, not for the protection of the Treasurer, but of the county. It has all the protection it requires without resort to a court of chancery. It has failed to make such a case as will warrant the inteference of the Court, and the bill must be dismissed at the complainant's cost.